IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-01544-RBJ

DUSTIN BUHRMAN,

      Plaintiff,

v.

AUREUS MEDICAL GROUP, a Nebraska corporation and
AUREUS NURSING, LLC, Nebraska corporation registered in Colorado,

      Defendants.

---

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This is an employment discrimination case brought under the Americans with Disabilities Act ("ADA"). This matter is before the Court on defendant Aureus Nursing, LLC's motion for summary judgment. ECF Nos. 48, 50. For the reasons discussed below, the Court GRANTS in part and DENIES in part defendant's motion.

## I. FACTUAL BACKGROUND

Plaintiff Dustin Buhrmann is a resident of Colorado. He is a practicing nurse, and he was employed by defendant as a travel nurse until September 2018. ECF No. 31 at ¶¶2, 5, 28–29. Defendant Aureus Nursing, LLC is a Nebraska corporation. "Aureus Medical Group" is a trade name. ECF No. 41 at ¶4. Defendant (or "Aureus") moves for summary judgment on plaintiff's claims. ECF No. 48. The undisputed facts are as follows.

Plaintiff applied for a registered nurse position with Aureus in April 2018. ECF Nos. 48-

1 at 23:7–24:10; 48-2.  Aureus made a job offer to plaintiff at the Medical Center for the Rockies in Colorado.  Plaintiff accepted the offer on April 10, 2018.  ECF Nos. 48-1 at 25:25–26:11; 48-3.  The offer was contingent on plaintiff's answering a Confidential Medical History Questionnaire and Personal Information form, which asked a series of health-related questions including "[d]o you have a blood-borne contagious disease?"  ECF No. 48-2.  Plaintiff answered "no" to that question when he filled out and signed the form on April 10, 2018.  *Id.*  The form further asked, "[h]ave you ever filed a worker's compensation claim or received benefits as a result of being injured or sick on the job?" to which he also responded "no."  *Id.*

The form contained the following language: "I hereby certify that the above information is a full, true, and accurate representation of my medical history and personal information."  *Id.* at 2.  At the time plaintiff filled out the form, however, he did have a bloodborne contagious disease—he had been diagnosed with HIV.  ECF Nos. 31 at ¶11; 48-1 at 30:11-13.  Plaintiff asserts that he did not believe he was being untruthful in his answer because he believed that he was exercising his right not to disclose a disability.  *Id.* at 28:5–29:10.

Plaintiff signed his contract with Aureus on April 14, 2018 and began working as a registered nurse at Medical Center of the Rockies.  ECF Nos. 48-1 at 30:19–31:16; 48-3.  The contract stated that plaintiff read, understood, and agreed to the terms of the contract, including the Aureus Code of Ethics.  The Code stated, "[i]f I fail to abide by these guidelines, I understand that Aureus may terminate my employment," and it listed "[f]alsification of documents" as a violation of the Code.  ECF No. 48-3 at 2.  Plaintiff also testified that he understood that falsifying documents was a basis for termination from Aureus.  ECF No. 48-1 at 33:7-25.

2

In July 2018, Plaintiff suffered an injury when a heart monitor fell onto his toe while he was transporting a patient. *Id.* at 38:25–39:7. Plaintiff filed an "Accident or Illness Report" in regard to this incident that included a release authorizing Aureus to obtain medical records regarding the accident. ECF Nos. 48-1 at 39:12–40:8; 48-4. Plaintiff received treatment at UC Health in Colorado for the injury. ECF No. 48-6. Aureus subsequently received medical records from UC Health on July 10, 2018. *Id.* Dana Gross, Safety and Compliance Coordinator for Aureus, reviewed plaintiff's medical records as part of her duties to evaluate injuries for which employees may receive workers compensation. She noted that the records indicated plaintiff had been diagnosed with HIV, which he had not disclosed in the April 2018 medical history form. ECF Nos. 48-5 at ¶¶3–4; 48-6 at 4. The medical records did not indicate the date of plaintiff's diagnosis. ECF No. 48-6 at 4. In her declaration for this lawsuit Ms. Gross wrote, "[w]ith no basis to show Mr. Buhrman falsified his medical history and his current employment ending on July 21, 2018, there was no reason to take any action." ECF No. 48-5 at ¶6.

Plaintiff's original contract with Aureus was due to expire on July 21, 2018. ECF No. 48-3 at 3. During summer 2018, plaintiff and Aureus agreed that plaintiff would take another assignment with Aureus in Alaska. ECF No. 48-1 at 47:22–48:21. On July 29, 2018 plaintiff filled out another job offer form that included the same medical history questionnaire as before. ECF Nos. 48-1 at 48:22–50:8; 48-7. In response to the question asking, "[d]o you have a blood-borne contagious disease?" plaintiff again answered "no." ECF No. 48-7. In response to the question about worker's compensation claims or benefits, plaintiff reported his recent toe injury from the fallen monitor. *Id.* On July 29 plaintiff also signed an employment contract for the Alaska job that was identical to the contract for his position in Colorado. ECF No. 48-8.

Plaintiff later disclosed during discovery that he had a right shoulder worker's compensation injury in 2015 that he had forgotten to put on the forms.  ECF No. 48-12 at 6.

After plaintiff submitted the form and contract, Operations Manager Stacey Lubash contacted plaintiff.  She informed him that Aureus was aware of his HIV diagnosis, and that he needed to complete a new job offer form to correct his answer to the bloodborne contagious disease question.  ECF No. 48-1 at 52:2-15.  On July 30, 2018 plaintiff completed and submitted the new form, this time answering "yes" to the question and writing "HIV/AIDS" as the explanation.  ECF No. 48-9.  That same day Ms. Lubash also sent plaintiff a Bloodborne Pathogens Questionnaire via email, which Aureus requires of all individuals who check "yes" to the bloodborne contagious disease question.  ECF Nos. 48-5 at ¶9; 48-10; 53-2 at 2.  The questionnaire required plaintiff and his treating physician to answer questions about whether plaintiff's HIV status interfered with his ability to safely perform his job.  ECF No. 48-10.  Plaintiff emailed Ms. Lubash back stating that he would get the form completed once he returned in September from his vacation.  ECF No. 53-2 at 2.

On September 5, 2018 plaintiff sent part of the Bloodborne Pathogens Questionnaire form back to Ms. Lubash.  ECF Nos. 48-10; 53-2 at 9.  She emailed back and forth with plaintiff about pages that had not come through.  Referencing some of the form's questions, plaintiff asked, "[t]his last form is very intrusive and quite degrading to me.  I'm not exactly sure why you need to know my medication schedule etc?  Is my employment dependent on me filing [sic] out this form?"  ECF No. 53-2 at 8.  Ms. Lubash forwarded plaintiff's message to Ms. Gross.  *Id.* In a subsequent email to Ms. Lubash, Ms. Gross wrote, "[c]onsidering he was diagnosed in 2012 and did not disclose it on his initial medical history form, we now have a new issue!  He falsified

his employment documents.  I don't see this as being any different than anyone else who knowingly withheld information and has been terminated.  Amy, what do you think?"  *Id.* at 4. In a later email she wrote, "I just remember catching this on his paperwork from his work injury. I thought he was recently diagnosed and that is the reason it wasn't on his med history form."  *Id.*

Plaintiff ultimately completed and sent the entire questionnaire to Ms. Lubash on September 5 because he was leaving the next day for the Alaska job.  ECF No. 48-1 at 65:4-13. On the form his treating physician, Dr. Cynthia S. Firnhaber, stated that plaintiff was "absolutely" able to perform invasive procedures safely and effectively because his HIV viral load is zero.  ECF No. 48-10 at 2.  On September 6, 2018 plaintiff flew to Alaska and had a layover in Seattle.  While at the Seattle airport he received a phone call from Will Pittack, his manager at Aureus.  Mr. Pittack told plaintiff that he was fired and mentioned a "zero tolerance" policy.  *Id.* at 65:14-21.  In her declaration Ms. Gross stated that she told Mr. Pittack to fire plaintiff and to inform him that "Aureus has zero tolerance for falsification of employment documents and because he falsified his Medical History forms Aureus was terminating him." ECF No. 48-5 at ¶12.  Plaintiff testified that after the phone call Aureus "left" him in Seattle, i.e. he was made to find his own way home after being fired.  ECF No. 48-1 at 65:14-15.  Plaintiff subsequently filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The EEOC sent him a right-to-sue letter on March 12, 2019.  ECF Nos. 31 at ¶33; 41 at ¶34.

As part of this litigation, Aureus produced a spreadsheet of about sixty employee terminations that list document falsification as the reason for termination.  ECF No. 48-11.  They involved forging or falsifying one or more of the following: timecards, certifications (such as CPR or licensures), immunization records, work experience, educational credentials, or job

references.  *Id.*; ECF No. 52-1 at 37:19–50:2.  In her declaration Ms. Gross stated that in the past

three years Aureus has employed both a Registered Nurse and a Sterile Processor who disclosed

that they were HIV-positive.  ECF No. 48-5 at ¶15.

## II. PROCEDURAL BACKGROUND

Plaintiff Dustin Buhrman filed this case on May 30, 2019.  ECF No. 1.  He filed an

amended complaint on September 26, 2019.  ECF No. 31.  That complaint alleged that Aureus

violated his rights under Title I of the ADA in two ways:[1] first, it discriminated against him by

firing him due to his HIV-status; and second, it made an unlawful inquiry into his disability.  *Id.*

at ¶¶36–37 (citing to 42 U.S.C. §§ 12112(a),(d)(4)(A) and 29 C.F.R. § 1630.14(c)).[2]

On October 10, 2019 Aureus filed a motion to dismiss, which the Court denied on

February 3, 2020.  ECF Nos. 36, 40.  Aureus submitted its answer ten days later on February 13,

2020.  ECF No. 41.  Following discovery, defendant filed a motion for summary judgment on

July 14, 2020.  ECF Nos. 48, 50.  Plaintiff responded on August 4, 2020.  ECF No. 52.  Aureus

replied two weeks later.  ECF No. 53.

## III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The

---

[1] Technically plaintiff's complaint sets out only one claim of action for both alleged violations.  However, because plaintiff relies on two different theories of violation, in this order I treat them as two separate claims.
[2] The relevant provisions of the Act referenced here are actually under The Americans with Disabilities Act Amendments Act of 2008, found at 42 U.S.C. §§ 12101, *et seq.*, which amended the original 1990 ADA.  However, for ease of understanding I refer to "the ADA" throughout this order.

nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment. *See Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## IV. ANALYSIS

In his amended complaint, plaintiff alleges that defendant violated his rights under the ADA in two ways. He first contends that Aureus fired him because of his disability, in this case his HIV-positive status, which would violate the ADA's anti-discrimination provision. Second, he contends that Aureus inquired into his disability, a move that is prohibited by the statute. ECF No. 31 at ¶¶36–37. Defendant moves for summary judgment on both alleged violations. ECF No. 48 at 1.

### A. Discriminatory termination under 42 U.S.C. § 12112(a)

The ADA expressly prohibits discrimination in the employment context on the basis of a disability. 42 U.S.C. § 12112(a) states, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." The term "covered entity" means "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C.

§12111(2).  Aureus is a covered entity under the ADA because it is an employer.

When there is no evidence of direct discrimination, as here, courts use the *McDonnell Douglas* burden-shifting framework to evaluate an ADA discrimination claim premised on disparate treatment.  *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (citing *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015)).  The first *McDonnell Douglas* step requires plaintiff to establish a prima facie case of discrimination.  Plaintiff's burden to establish a prima facie case for his discrimination claim is "not onerous." *Hawkins*, 778 F.3d at 883 (citing *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).  To establish a prima facie case, plaintiff must show that: "(1) he is 'disabled' within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job he holds or desires; and (3) [Aureus] discriminated against him because of his disability."  *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1189 (10th Cir. 2007).  Discrimination under step three requires plaintiff to suffer an adverse employment action.  *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011).  Adverse employment actions under the ADA include "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Once plaintiff establishes a prima facie case, under *McDonnell Douglas* the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action in question.  *Lincoln*, 900 F.3d at 1193 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  The employer's burden at this stage is "exceedingly light."  *C.R. England*, 644 F.3d at 1043 (quoting *Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002)).  If

the employer offers such a reason, the burden shifts back to the plaintiff to offer evidence that the reason is pretextual. *Lincoln*, 900 F.3d at 1193 (citing *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017)).

       1.   <u>Inference of termination based on disability</u>

Aureus does not directly contest plaintiff's disability[3] or his ability to perform the work activities of a nurse. Instead, Aureus states that it "assumes solely for the purpose of this motion" that plaintiff has a disability, and that he is qualified to perform his essential job functions with or without accommodation. ECF No. 48 at 12. I therefore also assume that plaintiff has met the first two requirements of his prima facie case. There is also no question that his termination constitutes an adverse employment action under the third requirement. 42 U.S.C. § 12112(a).

Aureus argues that plaintiff cannot establish a prima facie case because "there is no evidence that gives rise to an inference that he was terminated based on his HIV/AIDS diagnosis." ECF No. 48 at 12. It states that the only evidence possibly giving rise to such an inference is that plaintiff was terminated one day after Aureus received his Bloodborne Pathogens Questionnaire, but that this evidence in fact *cannot* show discrimination because Aureus had actually known of plaintiff's HIV diagnosis since July 2018. *Id.* I disagree.

"Depending on the specific facts of the case, temporal proximity can contribute to an inference of discrimination." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 (10th Cir. 2008). Normally temporal proximity is analyzed in the context of retaliation. *E.g.*, *Foster v. Mountain*

---

[3] Nor would Aureus likely be able to. HIV has long been recognized as a disability under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624, 630–31 (1998).

*Coal Co.*, LLC, 830 F.3d 1178, 1191 (10th Cir. 2016); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). However, in some instances the Tenth Circuit has also analyzed temporal proximity for claims of straightforward discrimination, not retaliation.  *E.g.*, *Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725, 731 (10th Cir. 2006) (unpublished) (noting that prior alleged instances of discrimination were too remote in time to be evidence of pretext); *Trujillo*, 524 F.3d at 1157 ("Close temporal proximity is important in establishing a prima facie case of association discrimination.").

Plaintiff has met his burden—which is "not onerous"—of proffering sufficient evidence to infer discrimination.  *Hawkins*, 778 F.3d at 883.  As defendant itself points out, defendant fired plaintiff within 24 hours of his submitting the Bloodborne Pathogens Questionnaire to Ms. Lubash.  Here, the single day between Aureus receiving more information about plaintiff's HIV status and his termination is extremely close temporally.  Furthermore, about eight weeks elapsed between when Aureus first learned of plaintiff's disability and when he was fired.  I also consider this to be sufficiently close in time to support a discrimination inference when combined with other facts that plaintiff presents.  *See Trujillo*, 524 F.3d at 1157–58 (crediting six-week period as evidencing inference of discrimination); *Anderson*, 181 F.3d at 1179 (noting one and one-half months was sufficient for inference without other evidence, whereas three months required additional evidence).

Plaintiff has presented other facts that support this inference as well.  Although Aureus had known of plaintiff's diagnosis since it received his medical records around July 10, 2018, the questionnaire he submitted on September 5—the day before he was fired—provided defendant

with significantly more information about plaintiff's disability.  ECF No. 48-6 at 4.  Also on

September 5, plaintiff resisted providing the detailed personal information by stating that he

found it "very intrusive and quite degrading" and asking if his employment depended on his

answering the questions.  ECF No. 53-2 at 8.  Although this is typically considered in a

retaliation claim, which plaintiff has not pled, the fact that plaintiff was fired the day after

pushing back on these questions also suggests that he was terminated, at least in part, because of

his disability.  Finally, in her email about the date of plaintiff's diagnosis, Ms. Gross wrote "we

now have a *new* issue!," which could suggest that either she or others at Aureus believed

something about plaintiff posed a problem as of when it first learned of his disability.  *Id.* at 1

(emphasis added).

Altogether, considering this evidence in the light most favorable to plaintiff, the facts

before the Court are sufficient to give rise to an inference of discrimination.  I find that plaintiff

has established a prima facie case of discrimination under the ADA.

> 2.  Legitimate, non-discriminatory reason and pretext

Because plaintiff has sufficiently established a prima facie case of discrimination based

on his HIV status, the burden shifts to Aureus to articulate a legitimate, non-discriminatory

reason for firing him.  *Lincoln*, 900 F.3d at 1193.  Aureus' proffered reason is that plaintiff

falsified his employment documents when he stated that he did not have a bloodborne contagious

disease on his Colorado and Alaska job offer forms.  ECF No. 48 at 13.

As defendant points out, courts have held that firing an individual for falsifying employee

records is a legitimate, non-discriminatory reason under *McDonnell Douglas*.  For example, in

*Vigil* the Tenth Circuit found that an employer had satisfied this burden by showing that it

believed plaintiff had submitted inflated overtime reports and then lied about it.  *Vigil v. Colorado Dep't of Higher Educ.*, 185 F.3d 876 (10th Cir. 1999) (unpublished).  *See also Wagoner v. Pfizer, Inc.*, 391 F. App'x 701, 705–06 (10th Cir. 2010) (unpublished) (finding that employer articulated legitimate, non-discriminatory reason when it claimed it fired employee for violating company policy by falsifying documents).  Aureus has thus met its "exceedingly light" burden to articulate a legitimate, non-discriminatory reason for plaintiff's termination.  *C.R. England*, 644 F.3d at 1043.  The burden now shifts to plaintiff to show that Aureus' reason was pretextual.

"In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision . . . we do not look to the plaintiff's subjective evaluation of the situation."  *Id.* at 1044 (internal quotation marks omitted) (citing *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1130 (10th Cir. 1998)).  To ultimately prevail on his claim, plaintiff must establish by a "preponderance of the evidence that the legitimate reasons offered by [Aureus] were not its true reasons, but were a pretext for discrimination."  *Trujillo*, 524 F.3d at 1155 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  At the summary judgment stage, however, "the trier of fact may consider evidence establishing the prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual."  *Id.* (citations and internal quotation marks omitted).  "To defeat [defendant's] claim on summary judgment, 'the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief.'"  *Id.* at 1158 (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1321 (10th Cir. 1997)).

The Tenth Circuit has explained how pretext can be shown:

> A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision. This is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence. A plaintiff may also show pretext by demonstrating the defendant acted contrary to a written company policy, an unwritten company policy, or a company practice when making the adverse employment decision affecting the plaintiff.

*DePaula*, 859 F.3d at 970 (internal citations and quotation marks omitted). Pretext can also be shown by evidence that "the defendant has shifted rationales for the adverse employment action" or that "the defendant has treated similarly situated employees who committed acts of comparable seriousness differently." *Didier v. Abbott Labs.*, 614 F. App'x 366, 374 (10th Cir. 2015) (unpublished) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). However, "[m]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson*, 181 F.3d at 1179 (citing *Morgan*, 108 F.3d at 1323).

Aureus argues that plaintiff provides no evidence that the reason was pretextual. ECF No. 48 at 14. Defendant is correct that plaintiff's providing false information on his job offer forms is undisputed, and that falsifying documents is a proper reason to terminate an employee. But neither of those is the question before the Court—instead, the question is whether plaintiff has offered enough evidence to create a genuine factual dispute about whether the reason for his termination was pretextual. I find that plaintiff has.

Plaintiff first points to an inconsistency in Aureus' purported reasoning for his termination. While Aureus states that it "has zero tolerance for employees falsifying information and terminates any employee [sic] does so," it did not terminate plaintiff when it first learned

that he provided false information on a job offer form, i.e. on July 29, 2018.  ECF No. 48 at 10.

Instead defendant waited more than a month to fire him, until after he provided additional

information through the Bloodborne Pathogens Questionnaire.  Nor was there any indication that

Aureus intended to fire plaintiff as a result of his providing false information until September

2018.  To the contrary, after Aureus received the Alaska job offer form where plaintiff answered

"no" to the bloodborne contagious disease question, Ms. Lubash sent plaintiff a new job offer

form and asked him to correct his answer because they knew of his HIV status.  Nothing in the

record suggests that plaintiff's initial "no" answer—undoubtedly a "falsification"—was a

problem, much less that it merited termination.

 Plaintiff also points to the difference between the false information he provided and the

false documents for which other Aureus employees were terminated.  Plaintiff's falsification of

documents comprised his not disclosing his HIV status on two job offer forms, purportedly

because he believed he was not required to.[4]  By contrast, the other terminated employees had

forged licensures or medical records or transcripts; lied about their work history, references, or

educational qualifications; or falsified time cards.  ECF No. 48-11.  Ms. Gross testified that none

of the employees included in Aureus' termination spreadsheet was fired for failure to disclose a

disability, as plaintiff supposedly was.  ECF No. 52-1 at 50:15-23.

 Plaintiff argues that these falsifications are "categorically different" than the non-

disclosure that plaintiff engaged in, and that they thus undermine the believability of Aureus'

non-discriminatory reason.  I am inclined to agree.  Lying about or forging one's job

---

[4] Aureus also points to plaintiff's failing to disclose his right shoulder injury under the worker's compensation question.  This in itself, defendant argues, justifies his termination.  ECF No. 48 at 15.  However, defendant only learned about that injury through discovery, long after plaintiff was fired and filed this case.  ECF No. 48-12 at 6.  It therefore could not have been the basis of Aureus' decision, and thus it is not relevant to the Court's analysis here.

qualifications demonstrates an explicit intent to deceive an employer, and falsifying timecards amounts to stealing wages for unworked hours.  Plaintiff's untruthful answers to the bloodborne contagious disease question are not to be taken lightly.  However, arguably they tend to reflect more a desire to protect one's privacy and guard against humiliation and prejudice (even if misguided and unlawful) than a resolve to deceive.  Plaintiff is not similarly situated to other terminated employees who falsified documents to the extent defendant claims.  This dissimilarity weakens Aureus' proffered reasoning and is also evidence of potential pretext.  Combined with Ms. Gross' email referencing another "issue," and his termination coming on the heels of the detailed questionnaire and pushback against answering some of the questions, plaintiff has provided sufficient evidence of pretext to survive summary judgment.

Aureus insists that its decision to fire plaintiff "had nothing to do with his disability," and that there is no evidence plaintiff was fired based of his HIV diagnosis.  ECF Nos. 48 at 16; 53 at 5.  To be sure, there is substantial evidence supporting Aureus' legitimate, non-discriminatory reason for termination, such as Ms. Gross' emails and Aureus' employment of two HIV-positive individuals in the last three years.  But a reasonable jury could still disagree with defendant.  Plaintiff has not engaged in "mere conjecture."  Viewing the evidence in the light most favorable to plaintiff, I find that there is a genuine dispute as to whether Aureus' reason for terminating him was pretextual.  The Court therefore denies defendant's motion for summary judgment as to the discrimination claim.

**B.  Prohibited medical inquiry or examination under 42 U.S.C. § 12112(d)**

Defendant also moves for summary judgment on plaintiff's claim regarding disability-related inquiries and medical examinations.  The ADA generally prohibits employers from

requiring medical examinations or inquiring as to whether an employee or prospective employee

has a disability, or as to the nature or severity of any disability.  42 U.S.C. § 12112(d).  There are

various exceptions to this rule, however.  The ADA's prohibitions and related exceptions fall

into three stages: (1) pre-offer, (2) post-offer, and (3) during employment.  *C.R. England*, 644

F.3d at 1046; U.S. Equal Emp. Opportunity Comm'n, ENFORCEMENT GUIDANCE: DISABILITY-

RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH

DISABILITIES ACT (ADA), 2000 WL 33407181, at *2.

At the first stage, when an applicant has applied for a job but not yet been offered it, all

disability-related inquiries and medical examinations are prohibited unless they related to an

applicant's ability to perform job-related functions.  42 U.S.C. § 12112(d)(2).  At the second

stage, after an applicant has been offered a job but before he or she has started working (often

called "post-offer pre-employment"), an employer may require a medical examination and may

condition the offer on the examination results provided that all entering employees are subject to

the examination regardless of disability.  *Id.* § 12112(d)(3).  At the third stage, during an

individual's employment, an employer is prohibited from requiring a medical examination or

inquiring into whether an employee has a disability, or the nature or severity of that disability,

unless it is "job-related and consistent with business necessity."  *Id.* § 12112(d)(4)(A).

Plaintiff asserts in his complaint that Aureus made an unlawful inquiry about his

disability in violation of 42 U.S.C. § 12112(d)(4)(A) (prohibiting inquiries or examinations at the

third stage, during employment).  He notes that the Bloodborne Pathogens Questionnaire in

particular asked about "his infection status, medications, medication schedule, medication

effectiveness, and also asked [him] to speculate as to 'what happens if [plaintiff doesn't] take the

medications.'"  ECF No. 31 at ¶25; *see also* ECF No. 48-10.  He argues that his HIV status did

not carry any risk to patients or the business, and thus Aureus did not need to know his status.

ECF No. 31 at ¶39.  As a result, patient contends, Aureus' inquiry into his HIV management was

not job-related or consistent with business necessity as required by the Act.  *Id.*

Aureus does not contest that either the two job offer forms or the Bloodborne Pathogens

Questionnaire constitute inquiries into whether plaintiff had a disability or the nature and

severity of that disability.  Instead, Aureus argues that these inquiries fall under the post-offer

pre-employment medical examination exception.  As long as it asks all similarly situated

individuals if they have a bloodborne contagious disease at this post-offer, pre-employment

stage, it asserts, the inquiry need not be job-related or consistent with business necessity.  ECF

No. 48 at 17.  Aureus also argues in the alternative that the Bloodborne Pathogens Questionnaire

*was* job-related and consistent with business necessity because it was the only way to determine

whether plaintiff had lied on his medical history form, and because it had a legitimate interest in

confirming that plaintiff could safely perform his job given his HIV status.  *Id.* at 18–19.

Plaintiff did not address the improper inquiry claim at all in his response to defendant's motion,

and thus he does not counter any of Aureus' arguments.  *See generally* ECF No. 52.

The extent to which Aureus may inquire into plaintiff's medical history depends on

which subsection of § 12112(d) his situation falls under.  As just stated, plaintiff claims that the

"during employment" rule (§ 12112(d)(4)(A)) applies, whereas Aureus claims that the "post-

offer pre-employment" rule (§ 12112(d)(3)) applies.  Aureus admits that plaintiff was employed

by Aureus Nursing, and that Aureus terminated him.  ECF No. 41 at ¶¶6, 29.  This suggests that

plaintiff should be treated as an employee, and that these inquiries should be analyzed under §

12112(d)(4).  However, the EEOC has provided guidance on § 12112(d) saying "[a]n employer should treat an employee who applies for a new job as an applicant for the new job." ENFORCEMENT GUIDANCE, 2000 WL 33407181, at *5.  I therefore find that the post-offer pre-employment rule under § 12112(d)(3) applies, not § 12112(d)(4)(A).

A further threshold issue is whether § 12112(d)(3) actually covers the questions that plaintiff was required to answer on Aureus' job offer forms and questionnaire.  That subsection of the statute mentions only medical examinations.  Nonetheless, the same EEOC guidance document explains that "[a]t the second stage (after an applicant is given a conditional job offer, but before s/he starts work), an employer may make *disability-related inquiries* and conduct medical examinations . . . ."  ENFORCEMENT GUIDANCE, 2000 WL 33407181, at *2 (emphasis added).  Similarly, the Tenth Circuit has stated that "the employer may condition an offer on the results of medical inquiries and examinations if they are required for all incoming employees," confirming that questions about an individual's medical history may be permissible at this stage. *Sumler v. Univ. of Colorado Hosp. Auth.*, 790 F. App'x 950, 954 (10th Cir. 2019) (unpublished). Thus, though the statute only explicitly mentions examinations, I read it to mean that inquiries are permitted at this stage as well.

I now turn to analyzing the inquiries themselves.  There are two sets of inquiries at issue in this case: (1) the question on defendant's job offer forms asking whether an individual has a bloodborne contagious disease; and (2) the entire Bloodborne Pathogens Questionnaire.  In order for Aureus to justify these inquiries under § 12112(d)(3), it must demonstrate that all entering employees are subject to the same inquiry or examination.  Aureus has met this burden for the question about bloodborne contagious diseases on the job, which plaintiff filled out for both his

Colorado and Alaska job offer forms.  The evidence before the Court indicates that question is included on all job offer forms for all prospective employees, and that all employees are required to answer the question.  Thus, the Court finds that Aureus did not made an unlawful inquiry into plaintiff's disability when it asked that question at the post-offer pre-employment stage.

The Bloodborne Pathogens Questionnaire is trickier.  Aureus claims this too falls under the blanket exception of § 12112(d)(3).  But the evidence does not demonstrate that Aureus subjects all incoming employees to this form—quite the opposite.  Only individuals who answer "yes" to the bloodborne contagious disease question must complete that form, as shown by plaintiff's only filling it out after Aureus discovered his HIV status.  Ms. Gross' declaration confirms this.  ECF No. 48-5 at ¶9 ("Aureus requires all individuals *who disclose they have a bloodborne contagious disease* to complete the Bloodborne Pathogens Questionnaire.") (emphasis added).  The questionnaire is essentially a series of follow-up inquiries asked of a subcategory of people based on the answer to a prior, valid inquiry.

Follow-up inquiries like these are permissible under the ADA.  The Tenth Circuit approved exactly this type of follow-up examination in *Sumler*.  There, the plaintiff's answers on a post-offer medical questionnaire led her prospective employer to order further screening to assess whether her use of narcotics, antidepressants, tranquilizers, or muscle relaxers would impact her ability to work as a sonographer.  *Sumler*, 790 F. App'x at 954; *see also Sumler v. Univ. of Colorado Hosp. Auth.*, No. 16-CV-02557-RM-KLM, 2018 WL 5043907, at *5–7 (D. Colo. Oct. 17, 2018).  The EEOC's technical manual permits this as well.  U.S. Equal Emp. Opportunity Comm'n, EEOCM1A, A TECHNICAL ASSISTANCE MANUAL ON THE EMPLOYMENT PROVISIONS (TITLE 1) OF THE AMENDMENTS WITH DISABILITIES ACT (1992), § 6.4 ("[T]he ADA

does not require that the scope of medical examinations must be identical.  An employer may give follow-up tests or examinations where an examination indicates that further information is needed.").

Here, Aureus has met its burden of showing that these further inquiries were necessary. As a nurse, plaintiff might be expected to engage in procedures that could place him, patients, or other medical personnel at risk due to his HIV-status.  The questionnaire appropriately seeks a treating physician's guidance on whether plaintiff or others in his situation can safely perform invasive, non-invasive, or exposure-prone procedures based on factors such as viral load.  ECF No. 48-10 at 2.  Other courts have recognized that such inquiries may be appropriate when a current or prospective employee's work could involve exposure to blood.  *E.g.*, *E.E.O.C. v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998) (approving use of medical examination for HIV-positive grocery store employee who regularly used knives and was susceptible to cuts and scrapes while working).

There are no genuine disputes of material fact regarding this part of plaintiff's claim.  I therefore find that, as a matter of law, Aureus' use of the questionnaire also did not constitute an unlawful inquiry in violation of the ADA.  The Court thus grants defendant's motion for summary judgment as to plaintiff's claim of unlawful inquiries into his disability.

## ORDER

The Court DENIES summary judgment to defendant on plaintiff's discrimination claim under 42 U.S.C. § 12112(a).  The Court GRANTS summary judgment to defendant on plaintiff's disability-related inquiry claim under 42 U.S.C. § 12112(d).

DATED this 11th day of February, 2021.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge